UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Mark A. Pemberton,<br>  Plaintiff,<br><br>    v.<br><br><br>Marco Rubio, Secretary,<br>  Department of State,<br>  Defendant | Case No.<br><br><br>JURY TRIAL<br>COMPLAINT<br><br>May 7, 2024 |

## COMPLAINT

Comes now, Mark A. Pemberton, by counsel, and files this Complaint.

## JURISDICTION AND VENUE

1. This Court has jurisdiction, and venue is proper, pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5(f)(3). Mr. Pemberton's employer, the U.S. Department of State, is headquartered in Washington, D.C.

2. Mr. Pemberton received a "Determination and Notice of Rights" letter from the Equal Employment Opportunity Commission (EEOC) on February 6, 2025, and has exhausted his administrative remedies under Title VII. 42 U.S.C. § 2000e-5(f)(1).

## PARTIES

7. Plaintiff Mark Pemberton has had a distinguished career as a Security Officer for the U.S. Department of State, quickly gaining trust and responsibility after his graduation from the Federal Law Enforcement Training Center in 2015. Since graduating he has served in posts all over the world, earning multiple promotions and awards along the way. His performance reviews have consistently been excellent.

1

8. Defendant Marco Rubio is the Secretary State for the United States and oversees the operations of the U.S. Department of State, which is an Agency of the United States government. Its mission is "[t]o protect and promote U.S. security, prosperity, and democratic values and shape an international environment in which all Americans can thrive."

**FACTUAL BACKGROUND**

9. In the early days of the COVID-19 pandemic, Mr. Pemberton refused to follow an order that he reasonably believed to be discriminatory when he declined to sign an optional "training pledge" that would have obliged him to refrain from attending the religious services required by his faith.

10. He explained to Diplomatic Security Mobile Security Deployments Office ("DT/MSD" or "MSD") Director Jeff Thomas that he could not sign a document or otherwise pledge not to attend religious services because he could not waive my Constitutional rights nor stop exercising my religious beliefs.

11. Jeff Thomas later retaliated by pursuing disciplinary actions against him for other protected activity in violation of the laws against prohibited personnel practices, as well as by reporting him to Diplomatic Security (DS) Insider Threat Programs (ITP) and making false statement about him that helped to precipitate a discriminatory investigation, disciplinary proceeding, and eventual proposal for suspension.

12. At roughly the same time, Department employee Kate Shilling reported Mr. Pemberton as a "white supremacist," claimed he might be an "insider threat," and claimed he was associated with "right-wing Christianity" based on my posting of a Christian prayer and a photo of a "traditional family" in front of an American flag on his personal social media.

13. Shilling and other Department employees also engaged in bullying by mocking his dating profile on a "Hall of Shame" in response to his preference for a "white," "Christian," "woman," who was interested in "starting a family."

14. This conduct by Department employees resulted in a hostile work environment as the allegations against him were defamatory, intimidating, hostile, and abusive in nature.

15. Among other things, they caused significant harm to his reputation, career, income, promotability, opportunity for assignment, and personal well-being over the course of a discriminatory investigation that has culminated in a proposed suspension.

16. Diplomatic Security's (DS) Office of Overseas Criminal Investigations (OCI) and Insider Threat Program (ITP) received the reports from Shilling described above and continued to discriminate against Mr. Pemberton based on race, color, national origin, religion, sex (pregnancy, gender identity, sexual orientation) by pursuing an investigation rather than declining to pursue allegations based in discriminatory animus.

17. ITP has a mandate to evaluate reports for legitimacy and protect innocent parties from baseless, discriminatory, or retaliatory allegations. However, prompted by Thomas's false statements, ITP chose to pursue allegations based in discriminatory animus.

18. DS's Office of Special Investigations (OSI) continued this pattern of discrimination by pursuing criminal and administrative actions against Mr. Pemberton on the basis of race, color, national origin, religion, sex (pregnancy, gender identity, sexual orientation), and reprisal. OSI attempted to have Mr. Pemberton criminally prosecuted for his religious speech, personal identity, and personal relationship preferences by referring him to the Department of Justice's (DOJ) Joint Terrorism Task Force (JTTF), Domestic Terrorism Task

Force (DTTF), National Targeting Center (NTC), Behavioral Analysis Unit (BAU), Human Rights and Special Prosecutions Section (HRSP), and Assistant U.S. Attorneys (AUSA).

19. HRSP is tasked with investigating and prosecuting international human rights violators for things like genocide, torture, war crimes, use of child soldiers, and female genital mutilation.

20. OSI's solicitation of this office to investigate his personal dating preferences raises significant questions as to the motivations behind the investigation itself.

21. Despite DOJ's repeated confirmations that there was no basis for allegations of association with extremist groups, OSI continued to pursue administrative employment action against Mr. Pemberton.

22. OSI harassed and bullied Mr. Pemberton in a compelled interview by, among other things, claiming his religious speech, personal identity, and personal relationship preferences were synonymous with, among other things, "white supremacy," "white nationalism," and "extremism." When OSI agents criticized his use of a Christian prayer on social media, he told them he believed they were discriminating against him for his protected speech and religious beliefs.

23. Despite Mr. Pemberton's efforts to explain the historical origins and religious importance of this prayer, OSI agents Palmer Jones and Kerri Hartman concluded in an official Report of Investigation that his activity was "notoriously disgraceful."

24. The report containing these discriminatory statements was approved by Supervisory Special Agents Joseph Wysowaty and Scott Messick, who as supervisors, had an affirmative duty to report discrimination.

25. Nonetheless, OSI maintained that Mr. Pemberton's protected religious speech was equivalent to involvement in "Religiously-Motivated Violent Extremism" (RMVE).

26. OSI agents also stated that Mr. Pemberton's personal relationship preferences regarding gender, race, family, and sexual orientation, which are derived from his own personal identity, were "concerning," and they claimed his interest in starting his own family and exercising his reproductive choices based on his sexual orientation, gender identity, and pregnancy preference made him comparable to a "white nationalist."

27. On numerous occasions during this compelled interview, Mr. Pemberton expressed his discomfort with OSI's harassment and discrimination based on his race, color, national origin, religion, and sex (pregnancy, gender identity, sexual orientation).

28. When he attempted to defend himself and explain how it was inappropriate to call someone a terrorist because of protected religious speech or personal relationship preferences, OSI agents retaliated by intensifying their harassment and bullying.

29. Mr. Pemberton believes that his resistance to their discriminatory allegations influenced their findings, as evidenced by OSI's Report of Investigation (ROI), which charged him with, among other things, "Notoriously-Disgraceful Conduct" and association with RMVE based on his protected religious speech. GTM later relied on this ROI to support its proposal for a six-day suspension.

30. At various times since the initiation of investigations and personnel actions against Mr. Pemberton based on his religious speech, personal identity, and personal relationship preferences, Department employees, including supervisory-level employees and mandatory reporters, have failed to report or oppose clear cases of discrimination and reprisal based on

protected categories and/or have chosen to enable, perpetuate, or participate in continued discrimination and reprisal themselves.

31.     In the past four years, Mr. Pemberton has voiced his complaints and objections of discrimination and reprisal to multiple Department employees, including supervisory-level employees and mandatory reporters.

32.     Mr. Pemberton has requested EEO counseling on several occasions, filed multiple Formal EEO complaints, filed multiple OCR complaints against individuals and offices involved in the investigation and personnel action against him, and made numerous FOIPA requests related to discriminatory behavior.

33.     Among those against whom Mr. Pemberton has made reports of discrimination are Department officials in DS/MSD, OSI, Global Talent Management, the Office of Management Resources, and Personnel Security, some of whom are now or have in the past been involved in the investigation and personnel action against him.

34.     Department officials involved in the disciplinary process were aware of his reports of discrimination and continued to pursue discipline influenced by previous and/or present discrimination and reprisal such as that evidenced by OSI's Report of Investigation (ROI).

35.      Mr. Pemberton currently subject to a proposed six-day suspension. The Proposing Official from GTM, Abigail Rupp, stated that she relied on the OSI ROI to make her determination of penalty.

36.     Rupp's determination of penalty is grossly out-of-proportion to the alleged offenses she specified in her charges.

37. Significantly, Rupp has engaged in the same activity as one of her specifications against Mr. Pemberton, posting a photo taken from inside a Department facility.

38. In summary, Rupp's determination of penalty is based on the discriminatory and retaliatory investigation initiated by Department employees and perpetuated by various offices within the Department and culminating in Rupp's own discriminatory animus toward Pemberton based on his Race, color, national origin, religion, sex (pregnancy, gender identity, sexual orientation), and protected activity.

39. As a result of the discrimination and reprisal described herein, Mr. Pemberton has suffered the loss of two promotions, which has resulted in the loss of tens of thousands of dollars over the past three years.

40. Mr. Pemberton has been passed over for assignments in favor of agents with similar experience that who have been promoted ahead of him.

41. Mr. Pemberton has suffered other professional and reputational harms as a result of his deferred promotions and as a result of OSI's defamatory allegations that have become known to his colleagues.

## COUNT ONE

### (Title VII Religious Discrimination: Disparate Treatment)

42. Plaintiff restates the foregoing paragraphs as set forth fully herein.

43. The Civil Rights Act of 1964 states in relevant part:

It shall be an unlawful employment practice for an employer –

(1) . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of

such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a); § 2000e-16(a).

44. Under Title VII, it is unlawful to discriminate in any aspect of employment, including:

> Hiring and firing; compensation, assignment, or classification of workers; transfer, promotion, layoff, or recall; job advertisements and recruitment; testing; use of employer facilities; training and apprenticeship programs; retirement plans, and benefits; other terms and conditions of employment.
>
> United States Department of Justice website https://www.justice.gov/crt/laws-we-enforce.

45. "To state a prima facie case of disparate treatment discrimination under [Title VII … a] plaintiff must establish that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that his employer took the action because of his membership in the protected class)." *Hutchinson v. Holder*, 668 F. Supp. 2d 201, 211 (D.D.C. 2009).

46. Mr. Pemberton experienced discrimination on the basis of the protected characteristics of race (Caucasian), color (white), sex (male), gender identity (male), religion (Christianity), and sexual orientation (heterosexual).

47. He has suffered an extended investigation rooted in baseless charges, has been proposed for discipline, and has been passed over at least twice for promotions because of this discrimination.

48. The investigations and proposed discipline make explicit reference to race, religion, and dating preferences, giving rise to the unmistakable inference that race, color, sex, gender identity, religion, and sexual orientation are all implicated in these discriminatory actions.

## COUNT TWO

### (Title VII Religious Discrimination: Harassment)

49. Plaintiff restates the foregoing paragraphs as set forth fully herein.

50. Under Title VII, employers cannot "harass an employee because of race, color, religion, sex (including sexual orientation and gender identity), or national origin." United States Department of Justice website https://www.justice.gov/crt/laws-we-enforce.

*51.* As the Supreme Court noted in *Harris v. Forklift*, 510 U.S. 17, 21 (1993), the language of Title VII "evinces a congressional intent to strike the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatory hostile or abusive environment," (*citing Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 at 64 (1986)). The injuries are "not limited to 'economic' or 'tangible' discrimination." *Id.*

52. "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.*

53. To succeed on a hostile work environment claim based on [a protected class], the plaintiff must demonstrate: "(1) that he was subjected to verbal or physical conduct [based on his protected class]; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).

54. To determine whether conduct is severe and pervasive, the court looks at the context of the alleged harassment to determine its frequency and severity, whether it is physically threatening or humiliating, and the extent to which it unreasonably interferes with the employee's work performance. *Id.*

55. The working atmosphere must be both subjectively and objectively abusive. *Id*.

56. Mr. Pemberton suffered an extended investigation, Report of Investigation, a proposed disciplinary action, and the associated phases of that proposed discipline, which are ongoing four years later.

57. These actions were based on his membership in the protected classes of race (Caucasian), color (white), sex (male), gender identity (male), religion (Christianity), and sexual orientation (heterosexual).

## PRAYER FOR RELIEF

58. All preceding paragraphs are fully incorporated as if set forth herein.

59. Plaintiff requests the following relief:

a. Compensatory damages, including back pay, forward pay, and emotional distress, in the amount of $2,500,000.

b. Attorneys fees and costs.

c. All other damages appropriate under the circumstances.

## JURY TRIAL

d. Plaintiff requests a jury trial.

Dated: May 7, 2025                               Respectfully Submitted,

_____
E. Scott Lloyd
Lloyd Law Group, PLLC
106 Chester Street, Suite 1

                                                Front Royal, VA 22630
                                                (540) 823-1110
                                                scott@lloydlg.com
                                                *Counsel for Plaintiff*